1

2

3

4                          UNITED STATES DISTRICT COURT

5                               DISTRICT OF NEVADA

6                                      * * *
                                         )
7    JULIE MCEWEN,                       )
                                         )
8                    Plaintiff,          )
                                         )
9    v.                                  )        2:09-CV-02173-PMP-LRL
                                         )
10   ACCELERATED COMMERCIAL              )        O R D E R
     CONSULTANTS, FRANK ULBRIGHT,        )
11   TERRY PRITCHETT, and MARK           )
     MASTRANGELO,                        )
12                                       )
                     Defendants.         )
13   _____ )

14           Presently before the Court is Defendant Mark Mastrangelo's Motion for

15   Summary Judgment (Doc. #88), filed on September 27, 2010.  Plaintiff Julie McEwen filed

16   an Opposition (Doc. #98) on October 25, 2010.  Defendant Mark Mastrangelo filed a Reply

17   (Doc. #110) on November 12, 2010.  The Court held a hearing on this motion on February

18   1, 2011.

19   **I.  BACKGROUND**

20           Defendant Terry Pritchett ("Pritchett") was the President of Defendant

21   Accelerated Commercial Consultants ("ACC").  (Def.'s MSJ, Ex. B.)  ACC was formed on

22   April 3, 2008.  (Def.'s MSJ, Exs. B, C.)  Defendant Frank Ulbright ("Ulbright") was ACC's

23   Secretary and a director.  (Def.'s MSJ, Exs. B, C.)  After ACC was formed, Defendant

24   Mark Mastrangelo ("Mastrangelo") acted as an unpaid advisor to ACC.  (Def.'s MSJ, Exs.

25   B, C, E.)  In September 2008, Mastrangelo was given authority to withdraw funds from the

26   ACC bank account.  (Pl.'s Opp'n, Ex. 4.)  A corporate banking resolution signed by

Pritchett, Ulbright, and Mastrangelo states that the following "named officer or employees of this Corporation" shall have signature authority on the account, and Mastrangelo is listed as one of these individuals. (Id.) Mastrangelo officially became ACC's Treasurer in June 2009. (Def.'s MSJ, Exs. B, C.)

While Mastrangelo was an unpaid advisor, Pritchett and Ulbright asked Mastrangelo to evaluate an investment opportunity known as the Tomco Project. (Def.'s MSJ, Exs. B, C.) Tomco is a concrete company which developed a machine that would facilitate the clean and safe disposal of slurry. (Pl.'s Opp'n, Ex. 6.) Plaintiff Julie McEwen's ("McEwen") boyfriend at the time, Chris Carriera ("Carriera"), was a Tomco employee. (Id.) Mastrangelo initially expressed the project had potential because it was a green project and concrete businesses needed a means to dispose of slurry. (Def.'s MSJ, Exs. B, C.) Additionally, ACC was reviewing other projects that involved substantial use of concrete, and the Tomco Project thus would have provided a good fit with ACC's other planned investments. (Def.'s MSJ, Ex. C.) Carriera contends Ulbright, Pritchett, and Mastrangelo promised him $500,000 for each investor he introduced to ACC who invested with ACC. (Pl.'s Opp'n, Ex. 1.)

Plaintiff McEwen was Pritchett's neighbor. (Def.'s MSJ, Exs. B, D at 9-10.) Pritchett would hold social gatherings in his garage, to which McEwen was invited. (Def.'s MSJ, Exs. B, C, D.) McEwen met Mastrangelo at one of these gatherings in the summer of 2008. (Def.'s MSJ, Ex. D at 9-10.) According to McEwen, Pritchett introduced Mastrangelo as his partner. (Def.'s MSJ, Ex. D at 10.) According to McEwen, Pritchett, Ulbright, and Mastrangelo told her she would become rich by investing with ACC. (Pl.'s Opp'n, Ex. 6.)

Pritchett told McEwen that ACC was going to fund the Tomco Project. (Def.'s MSJ, Ex. D at 17.) McEwen was going to invest money with ACC that would be used to purchase a $100 million bank guarantee that in turn would be used to fund the Tomco

Project.  (Def.'s MSJ, Ex. D at 17.)  According to McEwen, the entire $100 million was to be used for the Tomco Project, as represented to her by Pritchett, Ulbright, and Mastrangelo.  (Def.'s MSJ, Ex. 17.)  According to McEwen, these representations were made to her prior to her investing the funds with ACC.  (Def.'s MSJ, Ex. D at 17-18.)

According to Pritchett and Ulbright, Mastrangelo did not solicit contributions for ACC and "had no involvement in . . . McEwen's decision to place her money with ACC to fund the Tomco projects."  (Def.'s MSJ, Exs. B, C.)  Pritchett and Ulbright contend they never heard Mastrangelo say anything to Plaintiff suggesting she should invest with ACC.  (Def.'s MSJ, Exs. B, C.)  McEwen testified at her deposition that the only comment she could remember Mastrangelo making to her before she invested her money was that they were all going to be rich because the money she invested would produce a $100 million bank guarantee.  (Def.'s MSJ, Ex. D at 14-15.)  However, McEwen could not recall any specific representations Mastrangelo made to her regarding the project prior to the time she invested her money.  (Def.'s MSJ, Ex. D at 74.)  Mastrangelo denies that he ever told Plaintiff that those who funded ACC's efforts to obtain the bank guarantees were going to be rich, or that he made promises to her or offered an opinion regarding her investing funds with ACC.  (Def.'s MSJ, Ex. E.)

On October 14, 2008, McEwen entered into a contract with ACC pursuant to which she deposited $450,000 with ACC.  (Def.'s MSJ, Ex. A.)  In return, ACC agreed to pay McEwen $1.25 million within 90 days of the funding of the Tomco Project.  (Id.)  The contract is signed by McEwen, Ulbright, and Pritchett.  (Id.)  Plaintiff wired the money to ACC's trust account that same day.  (Def.'s MSJ, Exs. B, C.)

On October 21, 2008, ACC wired $650,000, which included McEwen's funds, to the law firm Murphy & Vickers in Texas, as part of a joint venture arrangement with a company called Republic Interests, LCC ("Republic").  (Def.'s MSJ, Exs. B, C, F; Pl.'s Opp'n, Ex. 10.)  According to Pritchett and Ulbright, this was done because the law firm

3

1  was going to assist ACC with obtaining a bank guarantee to fund the Tomco Project and

2  other projects.  (Def.'s MSJ, Exs. B, C.)  Murphy & Vickers then wired the money to an

3  attorney named Ron Arneson ("Arneson"), who represented William Hurst ("Hurst"), a

4  broker, on November 7, 2008.  (Def.'s MSJ, Exs. B, C; Pl.'s Opp'n, Ex. 11.)  Arneson was

5  to hold the funds in escrow pending provision of a bank guarantee by Halbau Project

6  Development, Inc. ("Halbau").  (Pl.'s Opp'n, Ex. 12.)

7           On November 10, Patrick Murphy ("Murphy") of Republic contacted Arneson

8  who informed Murphy that Arneson had wired the funds out without receiving confirmation

9  of the bank guarantee.  (Pl.'s Opp'n, Ex. 13.)  Republic issued a demand letter to Arneson

10 that same day, advising him he had violated the escrow agreement, and to return the funds

11 within twenty-four hours.  (Id.; Pl.'s Opp'n, Ex. 15.)  Murphy sent a followup email to

12 Arneson on November 12, which Murphy forwarded to Ulbright.  (Pl.'s Opp'n, Exs. 13,

13 16.)  Ulbright responded to that email, thanking Murphy and requesting Murphy keep him

14 advised of the situation.  (Pl.'s Opp'n, Ex. 16.)  That same day, Murphy spoke with Ulbright

15 who informed him that ACC would handle the problem because they had worked with

16 Hurst and Arneson before and could resolve the matter.  (Pl.'s Opp'n, Ex. 13.)

17          On November 20, ACC and Halbau entered into a profit sharing agreement

18 regarding a 100 million euro bank guarantee from Banco Santander.  (Pl.'s Opp'n, Ex. 17.)

19 The agreement was signed by Ulbright and Hurst.  (Id.)  The agreement states that "[a]s

20 owner of $700,000 that was deposited by wire to Ron Arneson's IOLTA bank account . . .

21 Accelerated Commercial Consultants is aware that Ron Arneson has bank wired the

22 $700,000 to Sagrado Oro, LLC, Las Vegas, Nevada, who bank wired the $700,000 to

23 Banco Santander, Bogota, Colombia, to cover the cost of bank verification and

24 authentication by MT 760 on Euroclear Screen of the $100,000,000.00 BG [bank

25 guarantee] by the to be named platform receiving bank."  (Id.)

26 ///

4

1    There is no documentary evidence in the record demonstrating where Arneson

2    actually wired the funds.  However, according to an affidavit signed by Ulbright in March

3    2010, "[i]n 2008, funds belonging to ACC in the amount of $700,000 were transferred to

4    . . . Mary Carillo and her company, . . . Sagrado Oro."  (Pl.'s Opp'n, Ex. 38.)  Ulbright went

5    on to aver that although Mary Carillo ("Carillo") and Sagrado Oro received ACC's funds,

6    they never provided the promised bank guarantee.  (Id.)  Ulbright further averred that

7    Carillo transferred $250,000 of those funds to Hurst in 2008.  (Id.)  Pritchett likewise avers

8    that after the money was transferred, he learned that a dispute had arisen between Hurst and

9    Carillo, and the money never was sent to the bank to obtain a guarantee.  (Def.'s MSJ, Ex.

10   B.)

11   In an April 2010 affidavit, Ulbright stated that Murphy & Vickers transferred the

12   $700,000 to Carillo.  (Pl.'s Opp'n, Ex. 39.)  However, the documentary evidence shows that

13   Murphy & Vickers sent the money to Arneson and that Ulbright knew it, as set forth in the

14   email from Murphy to Ulbright and the November 20, 2008 agreement between ACC and

15   Halbau, which Ulbright signed.  In the April 2010 affidavit, Ulbright again averred that

16   Carillo never obtained the bank guarantee and instead transferred $250,000 to Hurst.  (Id.)

17   There is no documentary evidence in the record showing Carillo ever received the funds or

18   transferred any funds to Hurst.  There is no evidence in the record of any agreement

19   between Carillo and/or Sagrado Oro and any other entity.  Ulbright stated that Carillo's

20   actions "caused performance of the Placement Agreement [with McEwen] impossible, and

21   subsequently, not effectuating the condition precedent to the 90 day period [in McEwen's

22   contract]."  (Id.)

23   In their affidavits supporting Mastrangelo's motion for summary judgment, both

24   Pritchett and Ulbright aver that ACC had received information that a bank guarantee was

25   obtained, but ACC subsequently learned the documentation was fraudulent and there was

26   no guarantee.  (Def.'s MSJ, Exs. B, C.)  Pritchett and Ulbright state that ACC made

1   demands on Hurst, Carillo, and Arneson for the funds, but the money was not returned.

2   (Def.'s MSJ, Exs. B, C.)

3       According to Murphy, he called Ulbright on December 15, 2008, to follow up,

4   and Ulbright informed him that they had received the funds back and the matter was

5   resolved.  (Pl.'s Opp'n, Ex. 13.)  In late 2008, Carriera ran into Mastrangelo at a local

6   grocery store and asked how the project was going, to which Mastrangelo replied that things

7   had slowed down over the holidays but that McEwen's money would be arriving any day.

8   (Pl.'s Opp'n, Ex. 1.)

9       In the meantime, Mastrangelo continued doing due diligence on the Tomco

10  Project.  (Def.'s MSJ, Exs. B, C.)  Mastrangelo expressed concerns regarding the company

11  based on some missing heavy equipment and a lack of proper financial documentation.

12  (Def.'s MSJ, Exs. B, C, E.)  ACC decided not to fund the Tomco Project in early February

13  2009.  (Def.'s MSJ, Exs. B, C, D at 106.)  Around that same time, Pritchett and Ulbright

14  informed McEwen about the decision not to fund the Tomco Project.  (Def.'s MSJ, Exs. B,

15  C, D at 106, G.)  The letter to Tomco advised that the reason ACC would not fund the

16  project was due to "[r]ecent actions by members of management of The Tomco

17  Corporation."  (Def.'s MSJ, Ex. G.)

18      According to Pritchett and Ulbright, McEwen agreed to keep her money with

19  ACC "in the hope of getting a return based on other ACC projects being financed."  (Def.'s

20  MSJ, Exs. B, C.)  According to McEwen, she went to ACC's offices and demanded ACC

21  return her money.  (Def.'s MSJ, Ex. D at 106; Pl.'s Opp'n, Ex. 6.)  McEwen avers that

22  Ulbright told her that her money was tied up in a bank guarantee, but that she would get all

23  the money promised to her plus interest soon.  (Pl.'s Opp'n, Ex. 6.)  McEwen also avers that

24  Pritchett and Ulbright on several occasions personally guaranteed she would get her money

25  back.  (Pl.'s Opp'n, Ex. 34.)

26  ///

1    A printout appears to show that Santander Bank issued a 100 million euro bank

2  guarantee on January 22, 2009 in favor of Halbau and ACC.  (Pl.'s Opp'n, Ex. 20.)

3  McEwen avers that in March 2009, Mastrangelo told her that ACC had eight bank

4  guarantees each worth $100 million, that her money would be coming soon, that when the

5  money came in they would fly to Mexico and stay at his condo to celebrate, that

6  Mastrangelo's wife looked over the paperwork and it looked good, and that Mastrangelo's

7  lawyers had traced the money and McEwen would be getting her money back.  (Def.'s MSJ,

8  Ex. D at 35, 55; Pl.'s Opp'n, Ex. 6.)  Mastrangelo denies that he ever told McEwen that her

9  contribution to ACC generated eight bank guarantees and she therefore would profit.

10  (Def.'s MSJ, Ex. E.)  Mastrangelo admits he believed that ACC had obtained a bank

11  guarantee until early November 2009, when Pritchett and Ulbright discovered that the

12  documentation Carillo sent them was fraudulent.  (Def.'s MSJ, Ex. E.)

13    McEwen sent several emails to the email account "loanfinder1@hotmail.com,"

14  which McEwen understood was an email account accessed by Pritchett, Ulbright, and

15  Mastrangelo.  (Def.'s MSJ, Ex. D at 97; Pl.'s Opp'n, Ex. 6.)  On June 29, McEwen sent an

16  email to Pritchett at the loanfinder email address asking if ACC had received her money.

17  (Pl.'s Opp'n, Ex. 34.)  On July 9, McEwen sent an email to the loanfinder email address

18  directed to Pritchett, Ulbright, and Mastrangelo.  (Pl.'s Opp'n, Ex. 34.)  McEwen stated that

19  she had talked to Pritchett the week before asking about when she would receive her

20  money, and Pritchett told her it would be a few days.  (Id.)  McEwen waited a few days and

21  then spoke to Ulbright, who informed her she would receive her money that week.  (Id.)  As

22  of July 9, she still had not received her funds.  (Id.)  Plaintiff demanded return of her funds.

23  (Id.)  That same day, McEwen received an email from "Accelerated Commercial

24  Consultants" promising her that "[w]e fully intend to make good on our agreement."  (Pl.'s

25  Opp'n, Exs. 6, 34.)

26  ///

7

On July 14, 2009, ACC sent McEwen a letter signed by Pritchett, Ulbright, and Mastrangelo which included a $3,000 interest payment. (Def.'s MSJ, Ex. D at 98, I.)  The July 14 letter stated that although ACC had experienced a delay, they were "pleased to inform you that the problem we experienced that caused this delay has been resolved." (Def.'s MSJ, Ex. I.)  The letter further promised that McEwen would be receiving a check for the principal amount, and "[w]ithin a reasonably short time after receiving a check for your principle amount you will receive your final check for the balance owed you as prescribed by your agreement." (Id.)  McEwen cashed the check, but disputed the amount of interest. (Pl.'s Opp'n, Ex. 34.)  On July 19, McEwen received an email from the loanfinder email address signed by "ACC" stating that "[e]verything is on track and moving forward as anticipated." (Pl.'s Opp'n, Ex. 34.)

On September 1, 3, and 9, 2009, McEwen sent emails to the loanfinder email address demanding her money. (Pl.'s Opp'n, Ex. 34.)  At some point in September, McEwen apparently received ACC documents from a former ACC employee, Karen Larson. (Def.'s Reply, Ex. E.)  When McEwen demanded an interest check for August, Ulbright responded by stating that McEwen was in possession of stolen goods, which is a crime, and that if she wanted her check, she could come to the office to drop off the stolen materials and pick up her check. (Pl.'s Opp'n, Ex. 34.)  McEwen responded by denying she had stolen goods, and demanding payment of all her funds by the end of September. (Id.)

Mastrangelo denies he sent or approved any emails to McEwen. (Def.'s MSJ, Ex. E.)  Mastrangelo admits he signed the July 14, 2009 letter. (Def.'s MSJ, Ex. E.) However, Mastrangelo denies he told McEwen the transaction would be fully funded, or that she would get her money on a specific date. (Def.'s MSJ, Ex. E.)  Mastrangelo denies he ever made any statement to McEwen to persuade her to invest with ACC or that he ever made a statement to her which he knew or believed to be false. (Def.'s MSJ, Ex. E.) Mastrangelo further denies that he ever accessed, possessed, or controlled any funds

8

deposited by McEwen.  (Def.'s MSJ, Ex. E.)

McEwen was not the only person who sent money to ACC and claims to have not received what was promised.  Non-party James Portese ("Portese") avers that he met Ulbright, Pritchett, and Mastrangelo, all of whom Portese characterizes as ACC partners, in September 2008.  (Pl.'s Opp'n, Ex. 37.)  Portese spoke with the three about investing in ACC.  (Id.)  On October 23, 2008, Portese sent ACC $100,000.  (Pl.'s Opp'n, Exs. 8, 37.) Portese avers he personally handed the $100,000 bank draft to Mastrangelo.  (Pl.'s Opp'n, Ex. 37.)  According to Portese, Mastrangelo personally guaranteed Portese would be paid back.  (Id.)  Portese started to become suspicious when he was not repaid and was met with various excuses.  (Id.)  In August 2009, Portese met with Ulbright, Pritchett, and Mastrangelo in ACC's offices, at which point Portese advised ACC that if he did not get his $100,000 back, he would report ACC to the Attorney General's Office.  (Id.)  About an hour after Portese left ACC's offices, Ulbright called and told him to come back and pick up a check for $100,000.  (Id.)  Portese returned, picked up his check, and signed an agreement with ACC that he would not discredit them or voluntarily testify against them. (Id.)

Similarly, Bradford Trotter ("Trotter"), through his company JBL Holdings, LLC ("JBL"), met with Ulbright, Pritchett, and Mastrangelo in May 2009.  (Pl.'s Opp'n, Ex. 30.) According to Trotter, all three represented themselves as ACC's principals.  (Id.)  Trotter avers that the three told him they would issue a $100 million bank guarantee from one of their bank accounts at a top 25 bank outside the United States.  (Id.)  In exchange, Trotter was to give ACC a $1.5 million fee.  (Id.)  The three also told Trotter the $1.5 million would be held in an attorney trust account until the bank instrument successfully was delivered to JBL's bank account.  (Id.)  In May 2009, JBL sent $1.5 million to an attorney trust account in Pennsylvania as designated by ACC.  (Id.)  Ulbright confirmed receipt of the funds.  (Id.)

On June 10, 2009, the Pennsylvania attorney wrote to Ulbright indicating that his efforts to wire the money to the accounts designated by Ulbright were unsuccessful, and the attorney therefore was returning the funds via endorsed check to Ulbright.  (Pl.'s Opp'n, Ex. 31.)  On June 17, ACC's checking account with Citibank showed a $900,000 deposit.  (Pl.'s Opp'n, Ex. 32.)  ACC's savings account with Citibank showed a $300,000 deposit on that same day, a $295,000 deposit on June 22, and a $5,000 deposit on June 24.  (Id.)  The Citibank account records show an $800,000 withdrawal from the checking account on June 17.  (Id.)  Over the next twelve days, the remainder of the funds in the checking account were depleted except for approximately $2,500.  (Id.)  The savings account in early July had a balance of over $500,000.  (Id.)  All but approximately $5,000 of those funds were withdrawn in the month of July.  (Id.)  ACC also had an account at SunWest Bank, from which Mastrangelo received $30,000 on July 10, 2009, as "payroll."  (Pl.'s Opp'n, Ex. 33.)

By June 2009, Trotter learned that ACC had possession of the $1.5 million even though JBL did not receive the bank guarantee.  (Id.)  Trotter thereafter obtained counsel and made demand on ACC.  (Id.)  As of February 2010, ACC and its principals have not returned the funds.  (Id.)

In a declaration filed in support of his reply, Mastrangelo avers that with respect to JBL, ACC "confirmed that the instrument from the bank was verified and at that time took a commission for their work.  I along with the other officers of ACC then received a commission for our work in facilitating the bank instrument on July 10, 2010."  (Def.'s Reply, Ex. A.)  Mastrangelo does not provide any documentation regarding the verification of the bank instrument.  Mastrangelo does not address Portese's allegations.

Plaintiff McEwen filed suit in this Court on November 12, 2009, against ACC, Pritchett, Ulbright, and Mastrangelo.  (Compl. (Doc. #1).)  The claims against Mastrangelo are for unjust enrichment (count five), monies owed (count six), fraudulent misrepresentation (count seven), negligent misrepresentation (count eight), conversion

10

(count nine), negligence per se (count ten), negligence (count eleven), constructive fraud (count twelve), breach of fiduciary duty (count fourteen), RICO (count fifteen), RICO conspiracy (count sixteen), racketeering (count seventeen), racketeering conspiracy (count eighteen), civil conspiracy (count nineteen), and for an accounting (count twenty-two).

Two weeks after McEwen filed suit, ACC commenced an action in Nevada state court against Carillo and Sagrado Oro.  (Pl.'s Opp'n, Ex. 35.)  That complaint references the $700,000 and contends that Carillo and Sagrado Oro were under a fiduciary duty not to use the funds for their own purposes, but they breached those duties by misappropriating ACC's funds.  (Id.)  The case remains pending in Nevada state court.

On September 15, 2010, Ulbright sent an unsigned letter to the email address "info@acceleratedcommercial.us."  (Pl.'s Opp'n, Ex. 41.)  The letter has a signature block for McEwen and states that McEwen–

> would like to take this opportunity to inform those that may question the honesty and integrity of Accelerated Commercial Consultants and it's [sic] Principals Terry Pritchett and Frank Ulbright that the things that have been posted to the internet defaming the afdorementioned [sic] are not my doing and I am trying to assist Accelerated and it's [sic] Principals to have these things removed.  I have been made aware through the content of depositions that were taken that the things that were alleged are false.  Accelerated and it's [sic] principals did not misappropriate any funds.  I was lied to by a disgrunteled [sic] former contract employee of Accelerated.  Documents were stolen fromn [sic] their office and selectively pieced together to create the picture and impression that misconduct had existed on Accelerated's part and that is not true.  We (Accelerated and myself) with the assdistance [sic] of my attorney are in the process of having the judgement rendered against Accelerated and it's [sic] Principals vacated.

(Id.)  Ulbright stated in the accompanying email that "[i]f we can get this or a version close to this that will establish that we are not thieves we can earn and get things and people made whole again."  (Id.)  No evidence suggests McEwen ever signed or approved such a statement.

Defendant Mastrangelo now moves for summary judgment on each of the claims against him on various grounds.  Plaintiff opposes the motion, except for the negligence-

based claims, which Plaintiff concedes are barred by the economic loss doctrine.

## II.  DISCUSSION

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).  Initially, the moving party bears the burden of proving there is no genuine issue of material fact.  Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002).  After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial.  Id.  The Court views all evidence in the light most favorable to the non-moving party.  Id.

### A. RICO - Counts Fifteen Through Eighteen

Mastrangelo argues he is entitled to summary judgment on these claims because he did not commit any criminal acts and was not part of a criminal enterprise.  McEwen responds that Mastrangelo, Pritchett, and Ulbright were engaged in an enterprise in fact, and he and his cohorts engaged in mail and wire fraud.  Specifically, McEwen argues that Defendants, including Mastrangelo, sent her emails and a letter by mail assuring her that she would receive her money soon, all while cleaning out their bank accounts and making no effort to repay her or Trotter, and paying Portese only upon his threat to go to the authorities.  McEwen notes that once she started demanding her money, Defendants made her interest payments to appease her until she filed suit, at which time the interest payments stopped.

///

McEwen further argues that Defendants have engaged in a pattern of racketeering activity, as demonstrated by the similar conduct with Portese and Trotter, and Ulbright's email in September 2010 demonstrates a threat of continuing behavior.  McEwen contends that despite his protestations, Mastrangelo personally participated in the fraud by telling her that if she invested to help obtain the bank guarantee they would all be rich, and by making false assurances to her later that her money would be coming soon to make her refrain from pursing legal remedies against Defendants.

To prevail on a federal civil RICO claim, a plaintiff must demonstrate "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'"  Living Designs, Inc. v. E.I. Dupont de Nemours & Co., 431 F.3d 353, 361 (9th Cir. 2005) (quotation omitted).  Pursuant to § 1962(d), it is unlawful to conspire to commit a violation of § 1962(c).[1]

To satisfy the first element, a defendant "must participate in the operation or management of the enterprise itself."  Reves v. Ernst & Young, 507 U.S. 170, 185 (1993).  Conduct "requires an element of direction."  Walter v. Drayson, 538 F.3d 1244, 1247 (9th Cir. 2008) (quotation omitted).  The defendant need not be "upper management" to conduct the enterprise's affairs, as an enterprise is "'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."  Reves, 507 U.S. at 184.  However, simply providing services to the enterprise without an element of direction is insufficient.  Walter, 538 F.3d at 1249.

An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a

---

[1] Nevada RICO claims are similar, but different conduct may constitute racketeering activity under Nevada state law.

legal entity."  18 U.S.C. § 1961(4).  A plaintiff pleads an enterprise through allegations of "an ongoing organization, formal or informal," and by allegations that "the various associates function as a continuing unit."  Odom v. Microsoft Corp., 486 F.3d 541, 549 (9th Cir. 2007) (en banc) (quotation omitted).  An organization is ongoing if it "is a vehicle for the commission of two or more predicate crimes."  Id. at 552 (quotation omitted). Allegations that the organization existed over a two-year timespan suffice to allege a continuing unit.  Id.  Where the plaintiff alleges an associated-in-fact enterprise, the plaintiff need not allege "any particular organizational structure, separate or otherwise."  Id. at 551.

A plaintiff establishes a pattern of racketeering activity by showing the participants in the enterprise committed at least two acts of racketeering.  Id. at 552; 18 U.S.C. § 1961(5).  To prove a pattern of racketeering activity, the plaintiff must show "that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity."  H.J. Inc. v. N.W. Bell Tel. Co., 492 U.S. 229, 239 (1989).  Predicate acts are related if they have similar "purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."  Id. at 240 (quotation omitted).

As to continuity, a plaintiff must show either a closed period of repeated conduct, or past conduct that by its nature projects into the future with a threat of repetition.  Id. at 241.  "Continuity does not require a showing that the defendants engaged in more than one 'scheme' or 'criminal episode.'"  Medallion Television Enters., Inc. v. SelecTV of Cal., Inc., 833 F.2d 1360, 1363 (9th Cir. 1987).  However, the circumstances in any particular case may demonstrate the predicate acts do not amount to a threat of continuing activity.  Id.

Racketeering activity includes "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . which is chargeable under State law and

punishable by imprisonment for more than one year."  18 U.S.C. § 1961(1)(A).

Racketeering activity also includes a variety of specified federal crimes, including mail and wire fraud.  Id. § 1961(1)(B).  To state the elements of wire or mail fraud, the plaintiff must allege (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the mails or wires in furtherance of the scheme; and (3) the defendants acted with the specific intent to deceive or defraud.  Miller v. Yokohama Tire Corp., 358 F.3d 616, 620 (9th Cir. 2004); United States v. Manion, 339 F.3d 1153, 1156 (9th Cir. 2003).  The mails or wires are used in furtherance of a scheme even if use of the mails or wires is not an "essential element" of the fraudulent the scheme, so long as it is "a step in the plot."  United States v. Shipsey, 363 F.3d 962, 971 (9th Cir. 2004) (quotation omitted).

Finally, to establish causation, the plaintiff must allege she was injured "by reason of" the defendant's alleged racketeering activity.  Living Designs, Inc., 431 F.3d at 362-63.  The plaintiff therefore must allege the defendant's conduct proximately caused her injury.  Poulos v. Caesars World, Inc., 379 F.3d 654, 666 (9th Cir. 2004).

Viewing the evidence in the light most favorable to Plaintiff, McEwen presents evidence raising an issue of fact as to each element.  First, she raises an issue of fact as to Mastrangelo conducting an enterprise.  She, Portese, and Trotter aver that Mastrangelo was presented to them as an ACC partner.  Mastrangelo had signature authority on the bank account; personally guaranteed Portese that Portese would get his money back; received the check from Portese; met with Portese, McEwen, and Trotter to discuss the various investments; and assured McEwen she would get her money back at the same time he, Ulbright, and Pritchett gave McEwen an interest payment.  Mastrangelo does not deny extensive involvement in ACC's activities even before he was formally named as ACC's treasurer.

The enterprise is either ACC itself or an association in fact between Ulbright, Pritchett, and Mastrangelo, which was an ongoing organization through 2008 and 2009.  It

is irrelevant when Mastrangelo officially became an ACC officer or director because an association in fact will suffice.  Even if Mastrangelo had to be an ACC officer or director, viewing the evidence in the light most favorable to McEwen, Mastrangelo was a partner with Ulbright and Pritchett, as represented to McEwen, Portese, and Trotter, even before Mastrangelo officially became ACC's Treasurer.

A genuine issue of material fact exists as to whether Defendants committed two acts of racketeering activity in the form of mail and wire fraud.  Viewing the evidence in the light most favorable to Plaintiff, Defendants engaged in three similar schemes against McEwen, Portese, and Trotter.  Ulbright and Pritchett promised McEwen a risk-free investment, personally guaranteed she would get her money back, and promised she would triple her investment within 90 days.  According to Portese, Mastrangelo made similar representations to him, including a personal guarantee that Portese would get his money back.  After McEwen and Portese invested, Defendants offered varying excuses as to why the funds were not available, and continuously put McEwen and Portese off as to when their funds would be available.  At the same time Defendants were telling McEwen via email and the July 2009 letter that her money would arrive any day, they were draining ACC's accounts of hundreds of thousands of dollars within a matter of weeks.  Mastrangelo admits signing the July 2009 letter in which he, Ulbright, and Pritchett advised McEwen that the problem causing the delay had been resolved and she would receive her money shortly.  Nothing in the record supports a reasonable belief on Defendants' part that either of these statements were true.  To this day, Plaintiff has not received her funds.

Portese received his money within an hour after threatening to report Defendants to law enforcement.  A reasonable jury could find that Defendants made promises to McEwen via email and mail and sent her an interest payment in an effort to appease her and keep her from similarly contacting authorities or seeking other legal remedies.  Thus, use of the mails and wires was part of the scheme to defraud.

Defendants also used the bank guarantee to induce Trotter to deposit $1.5 million in an attorney trust account which, like the attorney trust account in McEwen's and Portese's situations, released the funds in violation of the agreed conditions. There is no evidence that Defendants responded to Trotter's demands for repayment, and instead Defendants drained ACC's accounts of Trotter's $1.5 million within twelve days. Although Mastrangelo contends the Trotter deal was successful, Trotter states otherwise under oath. The Court must view the facts in the light most favorable to Plaintiff, and cannot resolve a credibility conflict between Mastrangelo and Trotter at the summary judgment stage. A reasonable jury could believe Trotter's version of events, particularly where no documentary evidence in the record supports Mastrangelo's version.

Defendants' explanation that Carillo spirited the funds away is undermined by their own statements on the issue. Although Defendants now contend they discovered Carillo's conduct in November 2009, Mastrangelo made no mention of that fact or defense in his opposition to McEwen's motion for partial summary judgment in April 2010 nor in his supporting affidavit. In an April 2010 filing, Ulbright and Pritchett contended that Murphy transferred the funds to Carillo, however viewing the documentary evidence in the lights most favorable to Plaintiff, the documents show that Ulbright knew in November 2008 that Murphy transferred the funds to Arneson, and Arneson had released the funds without authorization. Further, Mastrangelo's summary judgment motion states that Defendants were paying McEwen interest payments as they tried to recover the money from Carillo, but the interest payments were in July and August 2009, and Mastrangelo claims Defendants did not uncover Carillo's fraud until November 2009. Given Defendants' various statements on the issue, a reasonable jury could question the veracity of these explanations.

Moreover, Mastrangelo has presented no evidence as to what basis Defendants had for telling McEwen and Portese that their funds would arrive soon. The absence of any

such evidence could lead a reasonable juror to conclude that Defendants, including

Mastrangelo, knew all along that the funds would not be repaid, and they were simply

putting off McEwen and Portese while they either spent the money or sent it to a location

where McEwen, Portese, and Trotter could not locate it.

McEwen thus has presented evidence that Defendants had a scheme to defraud,

and that they used email and the mail as an essential step in the plot to attempt to appease

and put off McEwen when she started asking for her money.  Given the similar conduct

with respect to Portese and Trotter, and Defendants' efforts to keep Portese quiet by making

him sign a confidentiality agreement to get his money back, McEwen also has presented

evidence raising an issue of fact that the activity was continuous over a span of nearly a

year.  Moreover, Mastrangelo does not address the state law predicate acts McEwen asserts

in support of her Nevada RICO claims, including conversion and fraud.  Genuine issues of

material fact remain as to whether Mastrangelo was involved in a scheme to defraud

McEwen and others, and thus multiple acts of fraud would support the state law RICO

claims as well.  The Court will deny Mastrangelo's motion as to all state and federal RICO

counts.

## B.  Civil Conspiracy - Count Nineteen

Mastrangelo argues there is no evidence he formed a conspiratorial objective

with others to defraud McEwen, and he denies he was involved in inducing McEwen to

invest with ACC.  McEwen responds that the evidence shows Mastrangelo, Pritchett, and

Ulbright conspired to induce McEwen to invest her money to obtain a purported $100

million bank guarantee to fund Tomco, that Mastrangelo was a key player as he was

involved in many discussions on the topic and told McEwen if she invested to help obtain

the bank guarantee they would all be rich, and Mastrangelo assured Carriera everything was

on track.  McEwen further contends the defense that Carillo stole the money is a sham

defense, as demonstrated by the fact that Defendants never mentioned this issue until an

18

April 2010 affidavit by Ulbright, Defendants have changed stories on when they first discovered Carillo's alleged theft and who was involved with Carillo, no document ever has been produced showing Carillo took the money, and Defendants did not pursue legal action against Carillo until two weeks after McEwen filed her suit against Defendants.

As RICO is essentially a conspiracy to commit crimes, the same evidence raises a genuine issue of material fact as to conspiracy. As the Court previously set forth, viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that Mastrangelo, Ulbright, and Pritchett conspired to defraud McEwen. The Court will deny Mastrangelo's motion on this claim.

**C. Fraud - Counts Seven**

Mastrangelo argues there is no evidence he made any specific misrepresentation to McEwen that induced her to invest money with ACC. Mastrangelo contends the only statement McEwen attributes to him prior to her investing with ACC is that they would all be rich. Mastrangelo argues this is mere puffery and cannot support a fraud claim. Mastrangelo further argues that the statements McEwen attributes to him after she invested, such as that ACC had secured bank guarantees and they would fly to his condo to celebrate, are not actionable because McEwen has no evidence Mastrangelo knew the statements were not true when he made them. Mastrangelo also argues there can be no reliance on these statements because McEwen already had invested her money by that point. McEwen responds that she testified Mastrangelo made the "we'll all be rich" comment before she invested, and that it was specific enough to support a fraud claim because it was predicated on her investing in the bank guarantee. McEwen also argues that Mastrangelo made specific representations to her that her money would be coming soon to induce her to refrain from seeking legal remedies against Defendants, and this suffices to support a fraud claim.

To establish a fraud claim, a plaintiff must show by clear and convincing evidence: (1) the defendant made a false representation; (2) knowing or believing that the

representation is false or having an insufficient basis for making the representation; (3) the

defendant intended to induce the plaintiff "to act or to refrain from acting in reliance upon

the misrepresentation;" (4) the plaintiff justifiably relied on the misrepresentation; and (5)

the plaintiff suffered resulting damage.  Albert H. Wohlers & Co. v. Bartgis, 969 P.2d 949,

957-58 (Nev. 1998).

Viewing the evidence in the light most favorable to Plaintiff, Mastrangelo's

statement to McEwen prior to her investing with ACC is not mere puffery or too

non-specific to support a fraud claim.  McEwen testified that Mastrangelo stated to her that

if she invested her money so that ACC could obtain a $100 million bank guarantee to fund

the Tomco Project, they would all be rich.  If, at the time Mastrangelo made that comment,

he knew Defendants were not going to use McEwen's investment to get a bank guarantee

and instead were going to keep McEwen's funds for themselves, it is actionable fraud.  A

reasonable jury could so conclude.  As discussed more fully with respect to the RICO

counts, a reasonable jury could find that Defendants were engaged in a fraudulent scheme

to induce McEwen and others to give large quantities of money to ACC with no intent of

using it for the specified purpose, and with no intent to repay the funds plus interest as

promised.

Even if Mastrangelo's comment to McEwen prior to her investment is not

actionable fraud, Mastrangelo admittedly represented to McEwen in a July 2009 letter that

the problem causing the delay in receiving McEwen's funds was resolved and McEwen

would be getting her money soon.  A reasonable jury could conclude this was false and

Mastrangelo knew it was false.  Nothing in the record provides a basis for Mastrangelo's

statements that the problem had been resolved or that McEwen would be receiving her

funds soon.  At the time Mastrangelo made this representation, ACC had just taken

Trotter's $1.5 million and liquidated it.  Despite having enough funds to pay McEwen at

that time, ACC put her off with more promises while Defendants drained the bank accounts.

Around this same time, ACC paid off Portese when he threatened to report ACC to the authorities.  Further, Mastrangelo, Ulbright, and Pritchett have offered varying explanations of where the money has gone and when they discovered the alleged fraud by Carillo.  A reasonable jury could find that McEwen relied on Mastrangelo's promise of future payment by refraining from taking further steps to get her money back, or refraining from reporting Defendants to any law enforcement authorities.

Further, if Mastrangelo was involved in a conspiracy with Pritchett and Ulbright, he is responsible for his co-conspirators' fraudulent acts taken in furtherance of the conspiracy.  As discussed above, there is evidence from which a reasonable jury could conclude Mastrangelo was a participant in a fraudulent scheme with Ulbright and Pritchett. The Court therefore will deny Mastrangelo's motion as to the fraud claim.

### D.  Constructive Fraud and Breach of Fiduciary Duty - Counts Twelve and Fourteen

Constructive fraud "is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or to violate confidence."  Long v. Towne, 639 P.2d 528, 529-30 (Nev. 1982). "Constructive fraud is characterized by a breach of duty arising out of a fiduciary or confidential relationship."  Id.  Such a relationship exists "when one reposes a special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence."  Id.  The Nevada Supreme Court has held that fiduciary duties arise as a matter of law, such as insurers and insured, attorney and client, between spouses or fiancés, and corporate officers or directors and the corporation.  Giles v. General Motors Acceptance Corp., 494 F.3d 865, 881 (9th Cir. 2007).  Additionally, "[i]nvestment advisors have been held to occupy a confidential relation toward those advised."  Randono v. Turk, 466 P.2d 218, 222 (Nev. 1970).

Viewing the facts in the light most favorable to Plaintiff, McEwen fails to raise a genuine issue of fact that a fiduciary or confidential relationship existed between herself and Mastrangelo.  She did not have a friendship or other close relationship with Mastrangelo.  She met him not long before she invested with ACC.  She does not present evidence of a close relationship with him, and does not provide any basis for a fiduciary relationship other than that she invested funds with ACC; that Mastrangelo, Ulbright, and Pritchett were sophisticated businessmen who regaled her with tales of their financial successes and glamorous lifestyle; and Pritchett was her neighbor with whom she socialized.  Merely being a more sophisticated business person who regales a less sophisticated investor with tales of success and a lavish lifestyle during a few social gatherings does not create a confidential relationship.  Even if the mere investment of funds could create a fiduciary duty, McEwen entrusted her funds to ACC pursuant to a contract signed by Ulbright and Pritchett.  McEwen presents no authority that this would create a fiduciary duty running from Mastrangelo to McEwen.  Although ACC offered McEwen an investment opportunity, neither ACC nor Mastrangelo were her investment advisor.  The Court therefore will grant Mastrangelo summary judgment on the constructive fraud and breach of fiduciary duty claims.

**E.  Unjust Enrichment - Count Five**

Mastrangelo argues he is entitled to summary judgment on this claim because McEwen cannot show he obtained a benefit from McEwen's contribution to ACC. Mastrangelo argues the evidence shows McEwen wired the money to ACC, a few days later it was wired to Murphy & Vickers, and Mastrangelo never controlled it or benefitted from it.  McEwen responds that Mastrangelo exercised dominion and control over her funds because he had signatory authority over it, and he benefitted from it because he used it to to continue the scheme, obtain money from Trotter, and then pay himself $30,000.

///

Under Nevada law, unjust enrichment is "the unjust retention . . . of money or property of another against the fundamental principles of justice or equity and good conscience." Asphalt Prods. Corp. v. All Star Ready Mix, Inc., 898 P.2d 699, 701 (Nev. 1995) (quotations omitted). To establish an unjust enrichment claim, the plaintiff must show "a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit." Topaz Mut. Co., Inc. v. Marsh, 839 P.2d 606, 613 (Nev. 1992). An indirect benefit will suffice. Id.

Viewing the evidence in the light most favorable to Plaintiff, a genuine issue of material fact remains on this claim. McEwen conferred a benefit on Mastrangelo by investing with ACC. As discussed above, genuine issues of fact remain as to whether Mastrangelo conspired with Pritchett and Ulbright to defraud McEwen and others. A reasonable inference from that evidence is that Mastrangelo ultimately received a portion of McEwen's funds. Moreover, Mastrangelo received an indirect benefit from McEwen's investment because he was able through ACC to continue soliciting investors, received $1.5 million from JBL, and admittedly gave himself $30,000 of these funds. McEwen has made demand for return of her funds, and despite many promises of repayment by Mastrangelo, Pritchett, and Ulbright, has not been repaid. The Court will deny Mastrangelo's motion as to this claim.

### F. Monies Owed - Count Six

Mastrangelo argues that he did not sign any agreement with McEwen and thus McEwen cannot recover against him on any contract-based claim. McEwen responds that there is no requirement for a contract to support this claim. Rather, McEwen argues, Mastrangelo used her money contrary to her agreement with ACC and has failed to return it.

Under Nevada law, a claim "for money had and received can be maintained whenever one man has received or obtained the possession of the money of another, which he ought in equity and good conscience to pay over." Kondas v. Washoe County Bank,

271 P. 465, 466 (Nev. 1928).  For such a claim, privity need not exist between the parties, nor must there be "any promise to pay, other than that which results or is implied from one man's having another's money, which he has no right conscientiously to retain."  Id.  "When the fact is proved that he has the money, if he cannot show a legal or equitable ground for retaining it the law creates the privity and the promise."  Id.

This claim is similar to an unjust enrichment claim.  For the same reasons just discussed, the Court will deny Mastrangelo's motion as to this claim.

### G.  Conversion - Count Nine

Mastrangelo argues McEwen's conversion claim fails because she cannot show he exercised dominion or control over her money.  McEwen responds that Mastrangelo exercised dominion and control over her funds because he had signatory authority over the account into which her funds were placed.  She also contends that Defendants possessed her funds and refused to return them upon her demand, and that constitutes conversion.

As with the unjust enrichment claim, because genuine issues of material fact remain as to whether Mastrangelo was a participant in an overall scheme to defraud, genuine issues of fact remain as to this claim as well.  Because a reasonable jury could find scheme to defraud of which Mastrangelo was a participant, a reasonable jury could find Mastrangelo had dominion and control over McEwen's funds, either directly or through the acts of his co-conspirators.  The Court therefore will deny Mastrangelo's motion as to this claim.

## III.  CONCLUSION

IT IS THEREFORE ORDERED that Defendant Mark Mastrangelo's Motion for Summary Judgment (Doc. #88) is hereby GRANTED in part and DENIED in part.  The motion is granted as to Plaintiffs' negligence-based claims (counts eight, ten, and eleven), constructive fraud claim (count twelve), and breach of fiduciary duty claim (count fourteen).  The motion is denied in all other respects.

1          IT IS FURTHER ORDERED that the parties shall file a proposed joint pretrial

2    order no later than March 4, 2011.

3          IT IS FURTHER ORDERED that this matter is referred to Magistrate Judge

4    Lawrence Leavitt for a settlement conference.

5

6    DATED: February 4, 2011

7

8    _____

     PHILIP M. PRO

9         United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26